IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| **Louvinia Lambert,** as next friend to D.R., a minor, and **Verline Hartman,** | § § § § § | |
| *Plaintiffs*, | § § | **CIVIL ACTION NO. 9:20-cv-00097** |
| v. | § § | |
| **Angelina County, Texas and Southern Health Partners, Inc.,** | § § § § | |
| *Defendants*. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Verline Hartman and Louvinia Lambert, as next friend to minor D.R., (collectively "Plaintiffs") file this, their Second Amended Complaint, against Angelina County ("the County") and Southern Health Partners, Inc., ("SHP") for unlawful medical neglect resulting in the death of Janet Hartman, the daughter of Verline Hartman and mother of D.R., and would respectfully show the Court the following:

### I. PARTIES

1. Plaintiffs Verline Hartman and Louvinia Lambert are residents of the State of Texas.

2. Defendant Angelina County is a county of the State of Texas and has made an appearance in this case.

3. Defendant SHP is a Delaware corporation with its headquarters located in Tennessee and has made an appearance in this case.

## II.
## JURISDICTION AND VENUE

4. The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983. Supplemental jurisdiction over the negligence claim against SHP is proper under 28 U.S.C. § 1367 because that claim is so related to the claim under § 1983 that it is part of the same case.

5. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to the cause of action occurred in the Eastern District.

## III.
## FACTUAL ALLEGATIONS

6. On May 13, 2018, Janet Hartman, a 44-year-old inmate at Angelina County jail, died from pneumonia only hours after the jail finally decided that she was not, in fact, "faking it."

7. Hartman's death was completely avoidable and would not have happened if Angelina County and SHP had not ignored her clearly declining health for weeks. Furthermore, jail policy relied almost exclusively on non-medical staff to recognize and respond to medical emergencies, despite the fact that they had no training whatsoever to be able to do so.

8. Throughout several weeks leading up to her death, Hartman repeatedly notified jail staff, both orally and in writing, that she was unwell. However, medical staff employed by SHP at the jail refused to even examine her.

9. On April 24, 2018, Hartman filed a written "sick call slip" requesting medical care. In addition to complaining about shoulder pain, she wrote that "something is wrong," but that "it is not gas." Obviously this is referring to something other than her shoulder, but the only response was to "continue taking Tylenol" (Tylenol is an over-the-counter pain medication).

10. Although the call slip indicates Hartman was seen by medical staff, if that is true, she was not given even a cursory examination, because no vital signs were recorded. This is noteworthy because Plaintiff was taking medication for high blood pressure; it is nearly impossible to believe she would have been seen by a nurse without her blood pressure being measured. No other boxes on the slip are checked, such as "follow up required," "Patient was given medical instruction in regard to treatment plan," or "Patient advised to alert medical staff if condition worsens." In other words, nothing at all was done or communicated to Plaintiff.

11. On April 29, Hartman filled out a sick call slip saying, "I can't hold nothing down, I got diarrhea, I am weak and seeing black spots." She also indicated that this had been going on for three days.

12. Despite this worrying combination of symptoms, jail medical staff did not examine Hartman, and did nothing more than provide anti-diarrheal medication and advise her to drink more water.

13. This time, not a single box was checked on the call slip, including the one that would indicate Hartman had been actually seen by a nurse.

14. On May 4th, Hartman submitted an "Inmate Request Form," saying, "I need to see the Warden for a 1-on-1. I have serious problems going on with me. I would like to set up an appointment. Thank you very much. God bless you."

15. The only response she got was, "Please write what it is that may be ailing you on a grievance. We do not send request forms to [the] Warden, only grievances." Jail staff knew she was complaining about the lack of medical treatment ("what may be ailing you"), but they simply stiff-armed her request for help.

16. Around this time, Janet Hartman attended a hearing with her mother, Plaintiff Verline Hartman. Her mother observed that Janet "looked like death," and was concerned enough to complain to the judge that Janet had been very sick, but the jail medical staff was ignoring her. Verline asked the judge if she could get the jail to examine Janet. The judge, recognizing that Janet was indeed seriously ill, sent a message to the jail medical staff alerting them to the fact that Janet required medical attention. Deputy Herrington has stated in writing that he delivered the judge's note; however, medical staff still refused to examine her.

17. On May 13, at approximately 3 p.m., Verline Hartman called the jail because she was concerned about Janet and the fact that the medical staff was ignoring her illness. Sgt. Taylor Spinks spoke with Verline and said he would check on Janet personally.

18. Meanwhile, hallway trustee Edwena Summers had observed that Janet Hartman had been "defecating and vomiting most of the day." Summers was told by a correctional officer named Munn to fill out yet another sick call slip for medical. This is a bit like smelling smoke and deciding to write a letter to the fire department. No correctional officers did anything to notify medical staff that Janet was seriously ill.

19. When Sgt. Spinks arrived to check on Hartman, he refused to enter her cell due to the overpowering odor. Instead of showing any concern for Hartman's health, he left the area and instructed Officer Munn to have deathly-ill Hartman get dressed and come out to see *him*.

20. Another inmate, Sheila Wells, has stated that she had to beat on the door of the cell to let Officer Munn know how sick Hartman was. By the time anyone actually went in to see her, it was approximately 4 p.m. At that time, Hartman was observed to be "very weak with her head leaning to one side." Her "face was red with bluish tint around her mouth." Hartman was barely able to speak, but communicated that she had been "feeling like this for about three weeks." Her

fingers and toes were blue; her oxygen level was only 75%, and her blood pressure was 180/92. Her breathing was labored and made "crackling" sounds.

21. Hartman was finally transported to the hospital and arrived there at 4:32 p.m. The admitting doctor stated that when she arrived, she was in severe respiratory distress with severe pneumonia and lungs full of fluid. He also noted that at that time, Hartman had just a 5% chance of survival. Her eyes were "rolling around," she was vomiting into a CPAP device, and she was exhibiting agonal breathing. Agonal breathing is a very serious medical condition that frequently signals imminent death.

22. Hartman died only a few hours later, at 7:25 p.m. An autopsy concluded that the cause of death was pneumonia.

23. Hartman would not have died from pneumonia had staff at the Angelina County Jail not ignored numerous indications that Janet was severely ill, including Janet's own sick calls, her statements that her medication made her feel worse, and a note from a judge.

24. Multiple inmates have stated that the jail staff thought Janet was "faking" her illness. Rainbow Kessner, who had only come to the jail 11 days before Janet's death, said Janet had "just laid there and deteriorated." "We had told the nurses about Hartman. . . . We told Ms. Munn and she acted like she was concerned but the officers thought that Hartman was just complaining."

25. Moreover, the County and SHP maintained a health care system at the Jail that was <u>not subject to any oversight by a properly licensed medical provider</u>. This failure created a condition of confinement that prevented Janet Hartman from receiving sufficient medical care, and ultimately led to her death.

26. The contract between the County and SHP requires that the Jail employ a "Professional Provider" who is either a physician or a "mid-level practitioner." This follows

common sense: the Jail cannot be said to be satisfying its duty to provide medical care to inmates if there is no licensed physician who is ultimately responsible for that medical care. For example, the Jail would be unable to prescribe any medication to inmates without breaking the law.

27. Neither the County nor SHP employed a physician. Instead, SHP chose to use a physician's assistant—Robert Eastwood—as the "Professional Provider" required by the contract.

28. However, Eastwood was not properly licensed, because he had no supervising physician, as required by Texas law.

29. Beyond the mere identification of a supervising physician, Texas law states, "[s]upervision of a physician assistant by a supervising physician must be continuous. The supervision does not require the constant physical presence of the supervising physician where physician assistant services are being performed, but, if a supervising physician is not present, the supervising physician and the physician assistant must be, or must be able to easily be, in contact with one another by radio, telephone, or another telecommunication device." TEX. OCC. CODE § 204.204(b). In other words, the law requires some measure of continuous, active oversight by the licensed physician. This stems from the fact that a physician's assistant's scope of practice consists of "medical services delegated by a supervising physician." TEX. OCC. CODE § 204.202(a).

30. Here, Eastwood and the medical staff at the Jail had no supervision at all by any licensed physician. No physician had any involvement whatsoever in the medical care provided at the Jail. This not only created a condition of confinement in which inmates, including Janet Hartman, were precluded from receiving minimally acceptable medical care, but it is also constituted negligence *per se*: SHP and the County were breaking the law by performing the unlicensed practice of medicine. This ultimately led to Janet's death, which is precisely the type of harm the Texas medical licensing statutes were intended to prohibit.

31. Further, the contract did not even require Eastwood to be physically present at the Jail *at all*. Instead, it only required that he always be "available to our nursing staff for resource, consultation and direction." In other words, every determination regarding whether or in what manner medical care was to be provided to inmates was made entirely by nursing staff. Tellingly, Eastwood's name is almost entirely absent from Janet Hartman's medical file; the nurses never even bothered to consult him about her condition.

32. SHP was well aware that this total lack of physician presence at the Jail was grossly insufficient. In 2015, SHP accepted a contract to provide medical care at the Grant County Detention Center (GCDC) in Kentucky. One of SHP's primary assignments was to correct deficiencies found at GCDC in a 2005 U.S. Department of Justice (DOJ) investigation report. As such, it was intimately familiar with the report's findings.

33. The DOJ had found that the medical care at GCDC was inadequate, appeared "to result primarily from the shortage of medical staff at the facility." The DOJ pointed out that "<u>[a] physician on-site for two to three hours per week . . . is clearly insufficient to provide the medical care required for an institution the size of GCDC</u>." Further, the DOJ found that GCDC "lacks policies on, *inter alia*, timeliness of access to medical care," or "protocols for the nurse or the correctional staff to use to ensure timely access to the physician when presenting symptoms requiring physician care." Moreover, "many of [the] facility's policies and procedures lack the breadth and specificity to form an infrastructure to ensure timely access to the appropriate level" of medical care. Additionally, the DOJ found that the GCDC failed to keep organized and sufficiently detailed medical records, which contributed to the failure to provide adequate medical care.

34. By 2017, GCDC had still not been brought into compliance with the agreement it had made with the DOJ.

35. For comparison, with a capacity of 279 inmates, the Angelina County Jail is nearly the size of GCDC (350). If having a physician on site for 2-3 hours per week was "clearly insufficient" for a 350-bed facility, an unsupervised physician's assistant who did not have to be on-site *at all* is even worse, even at a slightly smaller facility.

36. Moreover, the medical care at the Angelina County Jail suffers from all the other shortcomings of infrastructure that had been pointed out at GCDC by the DOJ. Still, despite knowing that a system with these shortcomings was woefully deficient, SHP instituted a similarly deficient system in Angelina County.

## IV.
## FIRST CAUSE OF ACTION: MEDICAL NEGLECT IN VIOLATION OF 42 U.S.C. § 1983

37. All preceding paragraphs are incorporated here by reference.

38. At all times material to this Complaint, Angelina County and SHP acted under color of the statutes, customs, ordinances, and usage of the State of Texas and Angelina County.

39. Angelina County has a non-delegable duty under Texas law and the U.S. constitution to provide medical care to inmates at its Jail. The County cannot absolve itself of this duty by simply paying someone else to carry it out.

40. Likewise, by accepting the contract with Angelina County, SHP has taken on that same duty to meet the standard of care in its provision of medical services at the Jail.

41. Angelina County's policymaker with authority over the Jail is its Sheriff, or alternatively, the Commissioners Court. The Angelina County policymaker was fully aware of the contents of the County's contract with SHP, which specified required staffing and made obvious the reliance on untrained correctional officers to recognize and respond to medical emergencies.

42. Management at SHP has policymaking authority over the policies described in this lawsuit and utilized at the Angelina County Jail. The Chief Executive Officer, or in the alternative, the Chief Operating Officer has policymaking authority for policies of the type alleged in this lawsuit. Alternatively, SHP, as a single private entity, is itself a "policymaker" for purposes of § 1983 liability.

43. The policies described in this Complaint are the product of both Angelina County and SHP, which collaborated and agreed on exactly how the provision of medical care at the Jail was to be carried out.

44. Acting under color of law, Defendants Angelina County and SHP deprived Janet Hartman of the rights and privileges secured to her by the Eighth and/or Fourteenth Amendments to the United States Constitution and by other laws of the United States by failing to provide constitutionally adequate medical treatment. Plaintiffs plead their case under the alternative theories of conditions of confinement and episodic acts or omissions.[1]

45. The constitutionally inadequate system of medical care – the conditions at the Angelina County Jail – caused Janet Hartman to suffer a deprivation of her constitutional rights. These conditions of Janet Hartman's confinement as set forth in this Complaint were not reasonably related to a legitimate governmental purpose. These conditions amounted to punishment before she was judged guilty and thus violated due process of law. Angelina County's and SHP's intent to punish Janet Hartman may be inferred from their decision to expose pretrial detainees such as her to an unconstitutional condition. In other words, an official intent to punish may be inferred from general conditions, practices, rules, or restrictions of pretrial confinement.

---

[1] Plaintiffs may plead the alternative theories of conditions of confinement and episodic acts or omissions in a jail medical care case under 42 U.S.C. § 1983. *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009).

46. Angelina County and SHP are liable to Plaintiffs under 42 U.S.C. § 1983 for creating, maintaining, and perpetuating the conditions of confinement that resulted in the constitutionally inadequate medical care at its Jail.

47. The challenged conditions set forth in this Complaint violated Janet Hartman's constitutional rights and were the foreseeable product of the Angelina County's and SHP's decision to provide insufficient medical staff the Jail. There is no doctor on site, and the nurses frequently fail to physically examine an inmate who submits a request for care. Instead, the Jail relies on non-medical correctional staff to identify and respond appropriately to emergencies.

48. However, Angelina County and SHP did not sufficiently train and/or supervise their staff at the Jail, including non-medical correctional officers, to ensure that they were able to recognize and respond to emergencies properly.

49. Furthermore, the intended professional medical provider at the Jail was a physician's assistant who was not properly licensed. He had no supervising physician. Additionally, he was not required to spend any time actually on site at the Jail. This resulted in a situation in which no properly licensed physician was ultimately responsible for the medical care at the Jail.

50. The above policies, either individually or in combination, prevent a pretrial detainee at the Angelina County Jail from having access to medical care. None of these policies have a legitimate penological goal. Preventing a pretrial detainee's access to medical care cannot be seen as anything other than an unconstitutional punishment and is therefore an unlawful condition of confinement.

51. In the alternative, Angelina County and SHP are liable because the policies, customs or practices described above, including a failure to train and/or supervise their employees, were the

moving force behind episodic acts or omissions which resulted in violations of Janet Hartman's constitutional rights and caused the harm described in this lawsuit .

52. By their actions and/or inactions as described above, Defendants Angelina County and SHP have violated 42 U.S.C. § 1983 and the constitutional provisions cited in this Complaint.

## V.
## SECOND CAUSE OF ACTION: NEGLIGENCE

53. All preceding paragraphs are incorporated herein by reference.

54. Defendant SHP, as the contracted medical provider for Angelina County Jail, had a duty to provide competent medical care to Janet Hartman while she was detained at the jail.

55. SHP breached this duty through the actions and/or omissions of its employees, who abjectly failed to meet the standard of care in providing medical services to Janet Hartman.

56. SHP's actions and/or inactions were the cause-in-fact of Janet Hartman's death.

57. Janet Hartman's death was the foreseeable consequence of failing to provide any medical care whatsoever despite numerous signs, exhibited over a period of weeks, that she was gravely ill.

58. SHP can be presumed to have been negligent under a theory of negligence *per se,* because it participated in the unlicensed provision of medical care at the Jail. This violation of law proximately caused Janet Hartman's death, which is precisely the type of harm Texas medical licensing statutes are designed to protect people from.

*Gross Negligence*

59. Instituting a system of medical care at the Angelina County Jail as described above involved an extreme degree of risk, considering the probability and magnitude of the potential harm to inmates at the Jail.

60. SHP had actual, subjective awareness of this precise risk from its experience with GCDC and the DOJ report, but consciously ignored this risk.

## VII.
## DAMAGES

61. As a direct and proximate result of the above-described acts and omissions of Defendants, and/or individuals for whom the Defendants are legally responsible, Plaintiffs, and those interests that Plaintiffs legally represent, have suffered serious damages. Louvinia Lambert, as next friend of D.R., and Verline Hartman both seek damages under the Texas wrongful death statute. D.R., as an heir to Janet Hartman's estate, additionally seeks damages on behalf of Janet Hartman's estate under the Texas survival statute. Because D.R. is a minor, Louvinia Lambert is acting as her next friend regarding the estate claim. No administration of Janet Hartman's estate is pending, and none is necessary. Plaintiffs also seek the same damages under any applicable federal law.

62. Accordingly, Plaintiffs seeks to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above-described conduct. These damages include, but are not necessarily limited to, the following:

   a) Janet Hartman's physical suffering;

   b) Janet Hartman's mental pain and anguish;

   c) All reasonable and necessary burial expenses associated with Janet Hartman's death;

   d) Verline Hartman's mental pain and anguish arising from the death of her daughter, both past and future;

e) Verline Hartman's damages arising from the loss of companionship and society of her daughter, both past and future;

f) Verline Hartman's damages arising from the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that she would have received if Janet Hartman had lived, both past and future;

g) D.R.'s mental pain and anguish arising from the death of her mother, both past and future;

h) D.R.'s damages arising from the loss of companionship and society of her mother, both past and future;

i) D.R.'s damages arising from the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value she would have received if Janet Hartman had lived, both past and future;

j) Punitive and/or exemplary damages against all Defendants; and

k) Pre- and post-judgment interest in accordance with Texas law.

## VII.
## JURY DEMAND

63. Plaintiffs demand a trial by jury.

## VIII.
## PRAYER

FOR THE REASONS STATED ABOVE, Plaintiffs Verline Hartman and Louvinia Lambert, as next friend to minor D.R., request that Defendants Angelina County and SHP be summoned to appear and answer herein and that upon final trial or hearing, a judgment be entered in favor of the Plaintiffs and against the Defendants as follows:

a) Awarding Plaintiffs actual damages in an amount that is within the jurisdiction al limits of this Court;

b) Awarding Plaintiffs punitive or exemplary damages in an amount that is within the jurisdictional limits of this Court;

    c) Awarding Plaintiffs reasonable and necessary attorney's fees and costs of court;

    d) Awarding Plaintiffs pre-judgment interest at the highest rate permitted by law;

    e) Awarding Plaintiffs post-judgment interest at the highest rate permitted by law; and

    f) Awarding Plaintiffs all such other and further relief, at law or in equity, to which she may show herself to be entitled.

Respectfully submitted,

By: *Don Tittle*
    Don Tittle
    State Bar # 20080200
LAW OFFICES OF DON TITTLE, PLLC
6301 GASTON AVENUE, SUITE 440
DALLAS, TEXAS 75214
214/522-8400 – TELEPHONE
214/389-1002 – FAX
*ATTORNEY FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon counsel for Defendants by electronic service via the Court's CM/ECF system on this the 13th day of May, 2022:

| | |
|---|---|
| Larry J. Simmons<br>State Bar No. 00789628<br>Federal I.D.No. 18830<br>Carmen Jo Rejda-Ponce<br>State Bar No. 24079149<br>Federal I.D. No. 1366666<br>GERMER PLLC<br>America Tower<br>2929 Allen Parkway, Suite 2900<br>Houston, Texas 77019<br>(713) 650-1313–Telephone<br>(713) 739-7420–Facsimile<br>*Attorneys for Defendant*<br>*Angelina County, Texas* | James L. Cook<br>TX Bar No. 24034387<br>MORGAN, COOK & BECK, L.L.P.<br>3512 Texas Boulevard<br>Texarkana, Texas 75503<br>Telephone: (903) 793-5651<br>Telecopier: (903) 794-5651<br>Email: jlcook@mcblawfirm.com<br>*Attorneys for Defendant*<br>*Southern Health Partners*<br><br>*/s/ Don Tittle*<br>Don Tittle |